NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALFRED J., | ) |
| | ) Supreme Court No. S-17120 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-00236 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1718 – April 3, 2019 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Ariel Toft, Assistant Public Advocate, and Chad Holt, Public Advocate, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.  INTRODUCTION

A father appeals the superior court's decision to terminate his parental rights. He argues that the superior court erred in determining that the Office of Children's Services (OCS) made active efforts to prevent the breakup of his family as

---

\*  Entered under Alaska Appellate Rule 214.

required by the Indian Child Welfare Act (ICWA) and that terminating his parental rights was in his daughter's best interests. Because the superior court did not err, we affirm the termination of his parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Alfred J.[1] and Sylvia K. are the parents of Aaliyah, who is an Indian child as defined by ICWA.[2] Sylvia also has three other children, all of whom were living with her and Aaliyah.[3] In July 2010, before Aaliyah was born, Alfred and Sylvia's infant son died of sudden infant death syndrome. When Aaliyah was born in February 2011, she faced medical complications as a result of her premature birth. Because of her infant brother's recent death, OCS was notified when Aaliyah was born prematurely and in respiratory distress. OCS referred Alfred and Sylvia for in-home services and drafted a safety plan to ensure that they would comply with Aaliyah's discharge plan after she was released from the hospital. OCS closed its case in August 2011 because it appeared that Alfred and Sylvia were adequately caring for Aaliyah.

Alfred has a long criminal history, including a number of substance abuse and domestic violence offenses. In November 2009 he was arrested on an assault charge and probation violation and was sentenced to 60 days in jail. From then until late 2017 he was in and out of jail for substance abuse and domestic violence offenses, as well as violations of his conditions of parole and probation. In November 2017 he was arrested

---

[1]    Pseudonyms are used to protect the family's privacy.

[2]    Indian Child Welfare Act, 25 U.S.C. § 1903(4) (2012).

[3]    Sylvia, who relinquished her parental rights to Aaliyah and two other children, and consented to guardianship for the fourth, is not participating in this appeal.

on federal weapons charges and remained in federal custody through the termination trial.

In late 2015 and early 2016 the children's school reported that Aaliyah and her siblings were repeatedly absent and that staff members were concerned that Sylvia was using drugs. Between December 2015 and May 2016 OCS received several reports concerning Sylvia's drug use and the safety of her children. In May 2016 Sylvia submitted to hair follicle testing at OCS's request, which showed high levels of methamphetamine and amphetamine. OCS took emergency custody of the children. All of the children's fathers were incarcerated when OCS took custody.

Alfred was released from jail a month later and contacted OCS for the first time to schedule a visit with Aaliyah. At that time Aaliyah was living with one of her brother's paternal relatives, but OCS then moved Aaliyah and her sister to Sylvia's grandmother's home. Alfred did not ask OCS to return Aaliyah to him, but instead indicated that he would remain in contact with her foster parent. Within a week, OCS was unable to contact Alfred. The phone number he had provided would not allow OCS to leave voicemails and then was no longer in service. OCS sought contact information for him from both Aaliyah's foster parent and Sylvia, but neither was able to provide any information. In order to know if Alfred returned to jail, and to enable her to contact him there, the OCS caseworker set up a VINELink[4] notification.

While doing a home visit in the spring of 2017, a subsequent OCS caseworker noticed Alfred's truck parked near Aaliyah's foster home and left her

---

[4] VINELink is an online program that allows users to search for information about an offender's custody status, including locations and release dates, and set up alerts to notify them of changes in custody status. *VINE*, APPRISS SAFETY, https://www.vinelink.com/ (last visited Mar. 27, 2019).

business card on the windshield in the hope that he would contact her. Despite later acknowledging that he received the card, Alfred did not contact OCS.

As a result of their inability to find contact information for Alfred and Alfred's failure to contact OCS, the assigned caseworkers had no contact with him for nearly a year and a half. During that time OCS continued to send letters to the address on file for Alfred notifying him of the administrative reviews it scheduled in Aaliyah's case. OCS also drafted a case plan for the family, which required Alfred to make his daughter his highest priority, obtain a substance abuse assessment and follow its recommendations, complete parenting classes, and visit Aaliyah weekly. But because it was unable to contact Alfred, OCS never provided him a copy of the case plan, nor was Alfred able to complete any of the case plan's requirements or participate in administrative meetings.

In September 2017 OCS petitioned to terminate Alfred's parental rights to Aaliyah. In an attempt to serve the petition, OCS conducted a search for Alfred's address. OCS sent copies of the petition via certified mail to two addresses it believed might be good for Alfred, but the letters were returned as undeliverable. Around the same time, OCS moved Aaliyah from the home of her great-grandmother to the home of a paternal relative of Aaliyah's sister. OCS held a team decision meeting before moving her, but was not able to reach Alfred to invite him to attend.

In October 2017 Alfred's mother contacted OCS and requested that Aaliyah be moved to her home. Because his mother lived in California, OCS asked California's child welfare agency to conduct a home study pursuant to the Interstate Compact on the Placement of Children (ICPC). That process was not completed until the following spring.

Alfred finally contacted OCS in November from jail after being arrested on federal charges. He requested a visit with Aaliyah. Over the next couple months OCS

discussed the case plan with him and arranged a visit in January 2018. No further visits were arranged. The assigned caseworker testified that she was unable to arrange any more visits due to her unfamiliarity with federal custody procedures and her inability to place phone calls to Alfred because of what a correctional officer told her were security issues.

## B.    Proceedings

The termination trial started in February 2018. Alfred stipulated to OCS's trial brief as an offer of proof of the testimony of witnesses other than OCS's expert witness and one of the caseworkers. In addition to its offer of proof, OCS presented testimony from the two caseworkers who had been assigned to the case. Without objection from Alfred, OCS also presented expert testimony, as required by ICWA, from a social worker with years of experience working with Native families.[5] Alfred attended the trial by telephone and was represented by counsel. He neither testified nor presented any witnesses on his behalf.

The superior court terminated Alfred's parental rights, finding by clear and convincing evidence that Aaliyah was a child in need of aid due to abandonment, parental incarceration, and substance abuse.[6] The superior court further found that Alfred had failed "to change the cycle of use of substances, incarceration[,] and absence from [Aaliyah]'s life," and that he had failed to engage with OCS or Aaliyah. Additionally it found by clear and convincing evidence that OCS had made active efforts to reunite the family. And the court found evidence beyond a reasonable doubt that returning Aaliyah to Alfred's custody was likely to cause her substantial physical or emotional harm and that Alfred's harmful conduct was unlikely to change. Finally the

---

[5]    *See* 25 U.S.C. § 1912(f).

[6]    AS 47.10.011(1), (2), (10); AS 47.10.013(a)(3), (4).

court found by a preponderance of the evidence that it was in Aaliyah's best interests to terminate Alfred's parental rights.

Alfred now appeals the court's active efforts and best interests findings.

## III. STANDARD OF REVIEW

In cases involving termination of parental rights, "we review a superior court's findings of fact for clear error."[7] But "whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules" is a question of law, which we review de novo.[8] "A trial court's determination that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family presents a mixed question of fact and law"[9] — we review the superior court's factual findings for clear error, but we review whether those facts are sufficient to satisfy ICWA's active efforts requirements de novo.[10] "A trial court's determination that termination of parental rights is in a child's best interests is a factual finding that we review for clear error."[11]

---

[7] *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348 (Alaska 2016) (quoting *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1019 (Alaska 2012)).

[8] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[9] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013).

[10] *Id.*

[11] *Id.* at 962.

"We bear in mind at all times that terminating parental rights is a drastic measure."[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Determining That OCS Made Active Efforts.

To terminate the parental rights to an Indian child pursuant to ICWA, a trial court must find by clear and convincing evidence that OCS made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[13] Recently adopted regulations from the Bureau of Indian Affairs (BIA) define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[14]

When determining if OCS made the necessary active efforts, "the trial court may consider all services provided during the family's involvement with OCS."[15] "Failed attempts to contact the parent or obtain information from [a parent] may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of

---

[12] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

[13] 25 U.S.C. § 1912(d); *see also Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009).

[14] 25 C.F.R. § 23.2 (2018). Because OCS initiated the termination of parental rights after December 12, 2016, this case is governed by the BIA's new ICWA regulations. 25 C.F.R. § 23.143.

[15] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015).

services practically impossible.' "[16] Ultimately, the question is whether OCS's actions, viewed as a whole, "crossed the threshold between passive and active efforts."[17]

Alfred argues that OCS failed to make the requisite active efforts while he was incarcerated prior to November 2017. But OCS responds that Alfred was incarcerated "for only a small fraction of the time" that Aaliyah was in its custody, and that it was Alfred's "own decision to evade OCS [that] is the primary reason why OCS's efforts were unsuccessful."

The record shows that OCS made numerous unsuccessful attempts to contact Alfred following his initial contact with the assigned caseworker in June 2016 until he was arrested and returned to jail on federal charges in November 2017. Aaliyah's caseworkers made repeated phone calls; asked Sylvia for his contact information; asked Aaliyah's foster mother if she had heard from him; set up VINELink notifications; searched for Alfred's recent contact information; sent multiple letters to the addresses they had to inform Alfred of meetings and administrative reviews; and one caseworker left her business card on Alfred's windshield, which he later admitted to having received.

Between his release from jail and his return to incarceration nearly a year and a half later, Alfred never contacted OCS or provided updated contact information. Because OCS was unable to reach Alfred to arrange for his participation in the case plan, its efforts were unsuccessful. Its inability to reach Alfred for a year and a half meant that OCS was unable to assist him to make the changes required before Aaliyah could be

---

[16] *Id.* at 433 (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[17] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

returned to his care. When Alfred finally did make contact again in November 2017, OCS responded by meeting with him in December and setting up a visit with Aaliyah in January.

We have held that a court may consider "the parent's evasive . . . conduct"[18] or "demonstrated lack of willingness to participate"[19] in the case when determining whether OCS made active efforts as required by ICWA. Because OCS continued to try to contact Alfred when he was out of jail despite his lack of contact with them and despite the lack of working telephone numbers or valid addresses, we conclude that OCS satisfied ICWA's active efforts requirement.

## B. The Superior Court Did Not Err In Determining That Terminating Alfred's Parental Rights Was In Aaliyah's Best Interests.

Alaska law requires a trial court to find by a preponderance of the evidence that the involuntary termination of parental rights is in the child's best interests.[20]

### 1. Expert Testimony

Alfred first argues that OCS's proffered testimony was too general to satisfy the best interests requirement. He claims that the ICWA expert based his opinion on only a review of the record without any personal contact with either Aaliyah or Alfred. But neither ICWA nor its accompanying regulations require an expert to be

---

[18] *Sylvia L.*, 343 P.3d at 433.

[19] *Bob S.*, 400 P.3d at 107 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)); *see also Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021-22 (Alaska 2009) (finding a "demonstrated lack of willingness to participate" when a father was absent and failed to maintain contact with OCS).

[20] AS 47.10.088(c); CINA Rule 18(c)(3).

personally familiar with the parents or child.[21] Prior to the adoption of the new BIA regulations,[22] we held "that an ICWA expert may testify based on a review of documents in the record, without having had any personal contact with the parties, as long as the witness's testimony is grounded in the facts and issues specific to the case before the court."[23]

Here the expert witness discussed the specific safety threats Alfred posed, noting that Aaliyah had been exposed to Alfred's substance abuse, transience, domestic violence, and the adverse impact of having an incarcerated parent. The expert also specifically addressed the ways in which Alfred failed to mitigate his harmful conduct and how, if left unmitigated, it would harm Aaliyah. The expert explained how he reached these conclusions, and referred to the Adverse Childhood Experiences Study conducted by the Center for Disease Control for statistical support for his conclusions.

Further, OCS did not solely rely on the expert's testimony to prove that terminating Alfred's parental rights was in Aaliyah's best interests. In addition to the offer of proof in its trial brief, to which Alfred stipulated, OCS presented testimony from two OCS caseworkers and documented Alfred's criminal history, incarceration, and history of substance abuse and failed treatment. In light of the evidence presented without objection from Alfred, the superior court did not err in determining that OCS met

---

[21]    *See* 25 U.S.C. § 1912(f); 25 C.F.R. § 23.122; *see also Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 965 (Alaska 2013).

[22]    The new BIA regulations went into effect on December 12, 2016. 25 C.F.R. § 23.143.

[23]    *Thea G.*, 291 P.3d at 965; *see also Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1074 (Alaska 2018) (discussing new regulations and affirming holding in *Thea G.*, 291 P.3d at 965).

its burden of proving by a preponderance of the evidence that terminating his parental rights was in Aaliyah's best interests.

## 2. Lack of Permanent Placement

Alfred also argues that the court erred by terminating his parental rights before ensuring that Aaliyah would have a permanent home. He notes that based on ICWA's preference for kinship care, "OCS had to have presented at least some evidence as to why a decision on termination could not wait until after a decision" had been made on his mother's request to have Aaliyah placed with her.

Although a trial court may consider the lack of a proposed permanent placement as relevant in making its termination decision,[24] we have affirmed termination orders as in the best interests of a child even when a permanent home had not yet been found.[25] Moreover, Aaliyah was placed with foster parents who were willing to adopt her, but the adoption could not be finalized until after the court determined whether Alfred's parental rights should be terminated.[26] Alfred provides no specific reason why Aaliyah's current home was relevant to the termination of his parental rights. Sylvia had already relinquished her parental rights to Aaliyah and Alfred was and remains

---

[24] *See Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008) ("Thus, a court may consider favorable present placements as a factor in its best interests analysis. It follows that a court can also consider the fact that there are no favorable permanent placement options for a child (as in this case) as a factor in determining whether terminating a parent's rights would be in a child's best interest.").

[25] *See Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1024 (Alaska 2012); *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 937 (Alaska 2004); *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 655 (Alaska 2003).

[26] *See* AS 25.23.040(a) (requiring parental consent for adoption of a minor); AS 25.23.050(a)(5) (allowing adoption of a minor to occur without parental consent when parents' rights have been terminated under child in need of aid statutes).

incarcerated. Because neither parent was in a position to provide a home for Aaliyah, she could not be placed with them.[27] And it was the termination of Alfred's parental rights that transformed OCS's obligation to care for Aaliyah into a "legal duty to find adoptive placements for [her]."[28]

Moreover, Alfred is not even arguing that OCS should have considered placing Aaliyah with him; he did not request placement of Aaliyah at any time during the child in need of aid proceeding. Rather, he claims that because his mother would be a preferred placement under ICWA,[29] the superior court should have waited to terminate his parental rights until after the ICPC had been completed for his mother. But "nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights."[30] The requirement that termination of parental rights is in a child's best interests is a state law requirement, not an ICWA requirement.[31] The superior court therefore did not err in terminating Alfred's parental rights.

---

[27]    *See Doe*, 272 P.3d at 1024.

[28]    *Id.* (citing AS 47.10.088(i)).

[29]    *See* 25 U.S.C. § 1915(a) (giving placement preference to a child's extended family member).

[30]    *Doe*, 272 P.3d at 1026 (quoting *Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-12972, 2008 WL 5101809, at *9 (Alaska Dec. 3, 2008)); *see also Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1120 (Alaska 2010).

[31]    *Doe*, 272 P.3d at 1025.

## V.  CONCLUSION

Because the superior court did not err in determining that OCS made active efforts as required by ICWA or that terminating Alfred's parental rights was in Aaliyah's best interests, we AFFIRM the superior court's decision.